Filed 12/17/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| GEORGETOWN PRESERVATION SOCIETY, | C084872 |
| Plaintiff and Respondent, | (Super. Ct. No. PC20160205) |
| v. | |
| COUNTY OF EL DORADO et al., | |
| Defendants and Appellants; | |
| SIMONCRE ABBIE, LLC., | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Warren C. Stracener, Judge. Affirmed.

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiff and Respondent.

1

Michael J. Ciccozzi, County Counsel, Breann M. Moebius, Deputy County Counsel, for Defendants and Appellants.

Remy Moose Manley, Sabrina V. Teller, L. Elizabeth Sarine and Sara F. Dudley for Real Party in Interest and Appellant.

The Sohagi Law Group, Margaret Sohagi and R. Tyson Sohagi for The League of California Cities and the California State Association of Counties as Amicus Curiae on behalf of Appellants.

Aesthetics are subjective. But as we explained in *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903 (*Pocket Protectors*), and as the trial court found, lay opinions can provide substantial evidence to support a fair argument that a project may have a significant aesthetic impact on the environment, triggering the need to prepare an environmental impact report (EIR) pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code § 21000, et seq.).[1]

Georgetown is a quaint unincorporated Gold Rush-era hamlet in rural El Dorado County (the County, including defendant Board of Supervisors). Developer SimonCRE Abbie, LLC and its principals (Denton and Carolyn Beam, all collectively real parties) want to erect a Dollar General chain discount store on three vacant Main Street lots. Local residents acting through plaintiff Georgetown Preservation Society (Society) objected, claiming this would impair the look of their town. After real parties slightly modified the project, the County adopted a mitigated negative declaration, finding there was no basis to require an EIR. In response to the Society's mandamus petition, the trial court duly applied *Pocket Protectors* and found the Society's evidence supported a fair argument that the project may have a significant aesthetic effect on the environment, but rejected the Society's claims about traffic impacts and pedestrian safety, and declined to

---

[1] Further undesignated statutory references are to the Public Resources Code.

2

address the Society's claim the project was inconsistent with planning and zoning norms. Accordingly, the court issued a writ of mandate compelling the County to require an EIR.

On appeal, the County and real parties, supported by the League of California Cities and the California State Association of Counties (which together filed one amicus curiae brief), contend the trial court erred in finding an EIR was needed. They principally rely on the fact that the County applied its Historic Design Guide principles and found the project met aesthetic standards. In their view, the ensuing finding of compliance is entitled to the same deference due other interpretations and applications of the County's General Plan or zoning rules, and cannot be disputed by lay opinion evidence.

We disagree with this proposed method of bypassing CEQA and instead reinforce *Pocket Protectors* and hold that the Society's evidence of aesthetic impacts was sufficient to trigger the need for an EIR. A planning or zoning finding conducted outside the requirements of CEQA does not provide a substitute for CEQA review. Put another way, a planning or zoning decision may be entitled to greater deference than a mitigated negative declaration, but such a determination is no more than it purports to be and is not a *CEQA* determination.

Appellants also contend the public commentary was insufficient to trigger the need for an EIR and that the County was not required to make explicit foundational or credibility findings to disregard such commentary. We disagree with these claims as well.

Accordingly, we shall affirm the judgment issuing the writ of mandate.

## BACKGROUND

There is no dispute about the nature of Georgetown; it is a state Historical Landmark. It is located on the "Georgetown Divide" or "Divide" between the North and Middle Forks of the American River, not very far from Sutter's Mill on the South Fork of the American River in Coloma where the California Gold Rush began.

3

The project is proposed for what appellants describe on appeal as a 1.2-acre lot, but that lot consists of three parcels to be merged in a commercial zone on Main Street. The project area is surrounded by a museum, a historic stamp mill, a park, a post office, a local library, some commercial property, the American River Inn bed and breakfast, and a historic residence.

Dollar General distinguishes itself from similarly named competitors because it charges more than a dollar for many items, but agrees it is a chain discount store. The project consists of a 9,100 square foot store with an accompanying 12,400 square foot parking lot.

There is nothing like the proposed project in central Georgetown. Appellants emphasize an economic study in the record showing the area is underserved and that residents must travel to Auburn (19 miles west) or Placerville (16 miles south) for some of their shopping. There is already a Worton's Market (3,200 sq. ft.) on Main Street in central Georgetown. There is also a Mar-Val Food store (20,000 sq. ft.) and a hardware store in Georgetown's Buffalo Shopping Center, which is well outside the central historic area. There is also a Holiday Market (a "full-service grocery") and other shopping opportunities in Cool, about 12 to 13 miles away.

But the dispute before us centers on aesthetics rather than shopping opportunities.

Many project criticisms were received, some along these lines: "How can an out-of-state corporation come into an historic town such as Georgetown and build a monstrosity of a structure that no one wants . . . .?" A member of the family that owns the stamp mill across the street from the proposed store entrance testified the proposed "corporate structure" was "a blight on the heart of this town." A number of people signed letters arguing: "The size of the building and the need to provide corporate recognition would seem to preclude the possibility of making it conform to other buildings in the downtown district." Many others signed petitions stating other local businesses were run by families and this store would not fit in visually or functionally.

4

Within a large span of the administrative record labeled as "Comment letters on pre-typed forms" is a personalized letter by Jacqueline Morgan, a licensed architect who lives a block away from the project in a house that her family has owned since 1898. She opined in part: "The aesthetics of this building do not fit in with the historical guidelines for Georgetown" and did not belong "in an historic gold rush community." Tucked in a span of the record labeled as "Petitions of Georgetown Divide Residents Against Dollar General Store on Main Street" was another personalized letter.[2] The authors were Leon Alevantis, a registered professional engineer, and Tara Gauthier, a city planner. They live across the street from the project in the Schmeder house, built in 1908 but recently restored as a historic residence. In part they echoed the view that the size and look of the store would have a negative aesthetic impact.

The trial court particularly noted the views of Susan Infalt Dewar, a landscape architect and restoration ecologist born and raised in Georgetown who now lived in Placer County but still had family in Georgetown and who had followed the project. Dewar believed the "box-style building with 30 parking spaces" was "severely mismatched with the adjacent historic buildings" and would be a "giant blemish on the face of historic Main Street."[3]

---

[2] This letter is minimized in a footnote to the opening brief and its authors disparaged for their lack of documented expertise in "historic architecture." But as we note in Part IV of our discussion, *post*, appellants provide no authority for their apparent view that legitimate commentary on a matter of public interest--here, aesthetics in a gold rush town--require the commentator to be an expert in *any* particular field, let alone an expert in historic architecture.

[3] Again, appellants dismiss some commentators as "self-described" experts or because they did not detail their training and experience. As we explain in Part IV, *post*, if there were grounds to reject these commentators' credibility or the foundations for their opinions, the County should have made explicit findings thereon.

Real parties redesigned the exterior in part to add wooden siding and varied architectural details to break up its appearance and try to evoke the look of three separate buildings. But these changes were cosmetic and did not lessen the *footprint* of the building, nor significantly change its monolithic appearance.

The Society appealed the Planning Commission's approval (in the form of a denial of an appeal of the Planning Director's approval) to the Board, which denied the appeal. The County then filed its notice of determination, referencing a mitigated negative declaration.

In part the County found the project complied with zoning because the area was zoned for commercial retail and found, "The project has been reviewed in accordance with Section 130.74 of the County Zoning Ordinance. The project design, architectural treatments, and associated improvements substantially conform to the El Dorado County Historic Design Guide and would not substantially detract from Georgetown's historic commercial district."

The initial study states aesthetics were tiered off the County's 2004 General Plan EIR. (See 14 Cal. Code Regs., tit. 14, § 15152.) Later, it explains:

> "The DEIR for the General Plan had identified and examined the potential impacts that implementation of the General Plan would have to the visual character of the areas of the County. . . .
>
> "The proposed project would not be anticipated to significantly degrade the visual character or quality of the site and its surroundings in ways not anticipated for lands designated by the General Plan for commercial land uses. Further, the project site is designated with a Design Community (DC) combining zone to ensure architectural supervision and consistency with the EDC Historic Design Guide (HDG), which is used to evaluate the architectural and site design for the County's Historic Gold Rush Era Districts. The project design, through incorporation of architectural features and styling, proposed [construction] materials, and colors of the physical elements, were analyzed for consistency with the HDG. With the exception of the faux wood building signage and automated glass entry doors, the project was determined to be substantially consistent with the HDG.

6

"With review for consistency with [the General Plan and] the HDG, impacts would be less than significant. As designed and conditioned, project impacts would be less than significant."

The Society promptly filed the instant petition for writ of mandate. It alleged several CEQA violations--some of which have been abandoned--including that the County had not adequately reviewed traffic issues and aesthetics. In a second claim the Society alleged violation of planning and zoning laws, alleging the project was inconsistent with parts of the County's General Plan.

The County and real parties filed a joint answer.

After considering the moving and opposing papers and oral argument, the trial court issued a ruling finding that the public comments submitted to the County provided substantial evidence to support a fair argument that the project may have significant aesthetic impacts, thus requiring an EIR. The court found the County had made no credibility determinations regarding the public comments and therefore those comments could not be categorically disregarded. The court found evidence about pedestrian safety and traffic impacts was insufficient; it did not decide whether the project was consistent with the General Plan.

Appellants timely appealed from the ensuing judgment.

**DISCUSSION**

Appellants raise three major points in their briefing. First, they contend the County's finding that the project complied with planning and zoning rules via historic design review is entitled to deference and should be reviewed under a substantial evidence test. Second, they contend the lay public commentary does not establish a fair argument that the project may cause substantial environmental impacts; they also raise the subsidiary claim that the fair argument test should be directed to specific purported inconsistencies between the project and design review norms. Third, they contend the failure of the County to explicitly discount public commentary--that is, make specific

7

foundational or credibility determinations justifying disregard of public comments--should not preclude challenging the comments in the trial court or on appeal.[4]

As we shall explain *post*, we are not persuaded by any of these claims.

I

*CEQA*

We first set out a few of the general rules governing CEQA cases.

"According to our Supreme Court, 'the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citations.]" (*Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 880 (*Oro Fino*); see *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112; but see *Picayune Rancheria of Chukchansi Indians v. Brown* (2014) 229 Cal.App.4th 1416, 1422-1423, 1430 [suggesting a narrower interpretation of CEQA is now mandated by § 21083.1].) An EIR is viewed as the "heart" of CEQA. (See, e.g., *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123; *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 713.)

"All local agencies shall prepare, or cause to be prepared . . . an [EIR] on any project that they intend to carry out or approve which may have a significant effect on the environment." (§ 21151, subd. (a).) But to avoid the need to prepare an EIR for no reason, if there is a possibility that the project may have a significant environmental effect, an agency generally prepares an initial study, the purpose of which is "to determine if the project *may* have a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15063(a), italics added; see *Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 258.) "An initial study may rely

---

[4] Because the Society did not cross-appeal as to those issues on which it did not prevail, including its planning and zoning challenges, we need not and do not address them.

8

upon expert opinion supported by facts, technical studies or other substantial evidence to document its findings." (Cal. Code Regs., tit. 14, § 15063(a)(3).)

A negative declaration is "a written statement by the lead agency briefly describing the reasons that a proposed project, not exempt from CEQA, *will not have a significant effect on the environment* and therefore does not require the preparation of an EIR." (Cal. Code Regs., tit. 14, § 15371, italics added.) In turn, a mitigated negative declaration may be appropriate "when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans . . . would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, *and* (2) *there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment*." (Cal. Code Regs., tit. 14, § 15369.5, italics added.)

By statute, " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) By regulation, the term partly means "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project." (Cal. Code Regs., tit. 14, § 15382.)

For CEQA purposes "substantial evidence" "means enough relevant information and reasonable inferences from this information that *a fair argument can be made* to support a conclusion, *even though other conclusions might also be reached*. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (Cal. Code Regs., tit. 14, § 15384(a), italics added; see also § 21082.2.)

This unusual "fair argument" standard of review over a public agency's decision has been characterized as setting a "low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted. [Citations.]" (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1317 (*Sierra Club*); see *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 399 ["Because a negative declaration ends environmental review, the fair argument test provides a low threshold for requiring an EIR"] (*Ocean View Estates*).) The standard presents a legal question, "i.e., 'the sufficiency of the evidence to support a fair argument.' [Citation.] Under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary. [Citation.]" (*Sierra Club*, at p. 1318; see *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 576.)

With this brief CEQA overview in mind, we now address the claims on appeal.

II

*Effect of Historic Design Review*

As the trial court found and as we summarized *ante*, many commentators objected to the size and monolithic appearance of the project to try to achieve a fair argument showing that the project conflicted with the aesthetics of Georgetown. (See Part III, *post*.) Appellants contend that lay opinions conflicting with design review findings cannot satisfy the fair argument standard. In part they contend that "allowing non-expert, highly subjective opinions about aesthetic merit to override the agency's own design review determinations would unfairly inject uncertainty into the land use entitlement process. Appellants urge the Court to not let Society twist CEQA into a weapon that can

10

render established design review processes meaningless with a few strokes of the lay commenter's pen."**5**

We agree with appellants that design review is an important process, but we disagree that upholding this judgment will impair that process. Accepting the argument that design review controls CEQA review would subvert settled legal principles.

A leading treatise explains the fair argument standard as follows:

> "A strong presumption in favor of requiring preparation of an EIR is built into CEQA. This presumption is reflected in what is known as the 'fair argument' standard, under which an agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a project may have a significant effect on the environment. [Citations.] The fair argument standard applies both to agency decisions and to judicial review of those decisions. Agencies apply the fair argument standard as a substantive standard in deciding whether an EIR or a negative declaration is required. Courts apply the fair argument standard as a standard of judicial review for agency decisions to adopt a negative declaration. [Citations.]" (1 Kostka & Zischke, Practice Under Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2018) Initial Study, § 6.3.)

As stated *ante*, the fair argument standard purposely sets a low threshold of evidence in order to maximize environmental protections and thereby fulfill the purposes inherent in CEQA. (See, e.g., *Ocean View Estates*, *supra*, 116 Cal.App.4th at p. 399; *Sierra Club*, *supra*, 6 Cal.App.4th at pp. 1316-1317.)

In contrast, planning or zoning determinations are reviewed with greater deference, both because the public entity is deemed best able to interpret its own rules and because it is presumed to bring local knowledge and experience to bear on such issues. (See *Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434-435 [zoning]; *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th

---

**5** Appellants also claim Georgetown is not in a designated historic district. It does not appear that they raised this claim in the trial court. Further, appellants emphasize the completed historic design review and argue it precluded consideration of contrary public commentary. To now suggest such design review was unwarranted seems to be an attempt to have it both ways.

498, 515-516 [planning].) "A . . . determination that a project is consistent with the . . . general plan 'carries a strong presumption of regularity. [Citation.] This determination can be overturned only if the [entity] abused its discretion—that is, did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. . . . [A] determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, " . . . a reasonable person could not have reached the same conclusion." [Citation.]' [Citation.]" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 238 (*Clover Valley*); see *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1192-1193 ["If the agency's decision is not arbitrary, capricious, unsupported, or procedurally unfair, it is upheld;" " 'an agency's view of the meaning and scope of its own [zoning] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized' "] (*Anderson*).)

But the two different kinds of findings--a negative declaration under CEQA or a zoning or planning finding--answer different questions, such that different answers are not prohibited. A public agency's own design review is not a substitute for CEQA review. (See *Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 342 [applying an agency's threshold of significance may be useful, but does "not relieve a public agency of the duty to consider the evidence under the fair argument standard"] (*Mejia*); *Pocket Protectors*, *supra*, 124 Cal.App.4th at pp. 933-934 [rejecting application of zoning substantial evidence standard of review where zoning rules partly designed for environmental mitigation].) We have held "conformity with a general plan does not insulate a project from EIR review where it can be fairly argued that the project will generate significant environmental effects. [Citation.]" (*Oro Fino*, *supra,* 225 Cal.App.3d at pp. 881-882; see also *Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1338 (*Grand Terrace*).) We adhere to that view in this case.

12

Despite these settled authorities, appellants emphasize that the County reviewed aesthetics and rely in part on the italicized language from another case as follows:

> "The record establishes that the Project has already been subject to thorough design review. 'Virtually every city in this state has enacted zoning ordinances for the purpose of improving the appearance of the urban environment' [citation], and architectural or design review ordinances, adopted 'solely to protect aesthetics,' are increasingly common [citation]. *While those local laws obviously do not preempt CEQA, we agree with the Developer and the amicus curiae brief of the Sierra Club in support of the Project that aesthetic issues like the one raised here are ordinarily the province of local design review, not CEQA.* That the cases addressing such issues have arisen under local ordinances rather than CEQA is supportive of that view. [Citations.]

> "Here, the City found that the Project would not '[s]ubstantially degrade the existing visual character or quality of the site and its surroundings' within the meaning of Appendix G of the Guidelines in part because '[c]onstruction of this project is subject to design review and approval prior to issuance of building permits.' This finding was supported by the record of extensive design review in this case, was sufficient to address the Guideline criterion, and was consistent with a reasonable and practical reading of CEQA. *Where a project must undergo design review under local law, that process itself can be found to mitigate purely aesthetic impacts to insignificance, even if some people are dissatisfied with the outcome.* A contrary holding that mandated redundant analysis would only produce needless delay and expense." (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 593-594, italics added (*Bowman*).)

As the italicized passages of *Bowman* indicate, that court did *not* hold a zoning determination about aesthetics obviates CEQA review nor that design review *necessarily* or *always* adequately addresses aesthetic impacts, as the County contends. It depends on the facts. In another passage *Bowman* agreed with the widespread view that "[s]tatements of area residents who are not environmental experts may qualify as substantial evidence if they are based on relevant personal observations or involve 'nontechnical' issues. [Citations.]" (*Bowman*, *supra*, 122 Cal.App.4th at p. 583.) And as we pointed out in *Pocket Protectors*, the *Bowman* holding was narrow:

> "The project in *Bowman* . . . is a single four-story building intended to provide low-income housing for senior citizens, with retail on the ground floor.

13

The building is to be located on a heavily trafficked thoroughfare on a site zoned for mixed-use residential and commercial development, now occupied by parking lots and a vacant, graffiti-scarred, one-story commercial building of no architectural value. [Citation.] As the court characterizes the objectors' aesthetic arguments, they amount to the claim that the building should be one story lower, so as to fit in better with the scale of the surrounding residential neighborhood. [Citation.] *Unsurprisingly, the court concludes that the difference between a three-story building and a four-story building does not amount to a significant environmental impact even under the fair argument standard.* [Citation.]" (*Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 939, italics added.)

True, like this case *Bowman* involved a single building. But properly understood, *Bowman* merely supports the unremarkable proposition that an entity's zoning review forms part of the entire body of evidence to consider when determining whether the (low) fair argument standard has been met. In some cases, "that process itself can be found to mitigate purely aesthetic impacts to insignificance, even if some people are dissatisfied with the outcome." (*Bowman*, *supra*, 122 Cal.App.4th at p. 594.) But to the extent that appellants and amici curiae read into *Bowman* that design review *always* mitigates aesthetic impacts, such an interpretation is inconsistent with CEQA.

Similarly, to the extent appellants contend the public comments were "contradicted by undisputed experts," such purported contradiction does not eliminate the need for an EIR. (1 Kostka & Zischke, Practice Under Cal. Environmental Quality Act, *supra*, Initial Study, § 6.37; see Cal. Code Regs., tit. 14, § 15064(f)(1) ["if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect"]; *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1000-1001.) "If such substantial evidence exists . . . preparation of an EIR is mandatory. Consideration is not to be given contrary evidence supporting the preparation of a negative declaration. [Citations.]" (*Citizen's Com. to Save Our Village v. City of Claremont* (1995) 37 Cal.App.4th 1157, 1168 (*Claremont*).)

14

Appellants and amici curiae claim the Society is attacking the County's Historic Design Guide. But instead the Society merely makes the benign (and correct) argument that application of such design guidelines does not insulate the project from CEQA review at the initial study phase under the fair argument standard. (Cf. *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492-494 [at the *EIR stage*, thresholds of significance may defeat an aesthetics challenge]; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 625-627 [similar holding, explicitly distinguishing the fair argument standard applicable to a negative declaration from the substantial evidence standard applicable to an EIR].) Such review is entitled to deference as appellants and amici curiae point out. But that process cannot be used to bypass the normal fair argument standard. Instead, as appellants suggest, the results of such review may provide substantial evidence of a lack of environmental impacts, but if contrary evidence meets the fair argument standard, an EIR is required. (See *Claremont*, *supra*, 37 Cal.App.4th at p. 1168.)[6]

III

*Application of the Fair Argument Standard*

Appellants properly point out that the mere existence of a public controversy does not satisfy the fair argument standard. (See § 21082.2, subd. (b); *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1080-1081.) They portray this case as raising no

---

[6] Appellants cite *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086 to support the view that the Society had to show the design guidelines were unreasonable. The passages on which they rely discuss the application of and standard of review over a regulation allowing "unusual circumstances" to bar application of categorical exemptions from CEQA. (*Id*. at pp. 1113-1117; see Cal. Code Regs., tit. 14, § 15300.2(c).) That has nothing to do with this case. Appellants also cite to the part of *Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039 that held the "fair argument" standard is not used when considering whether a categorical exemption (there, for historic resources) applies. (*Id*. at pp. 1069-1072.) We fail to see the relevance of this point to the issues in this case.

more than a public controversy and challenge the adequacy of the Society's "unsubstantiated lay opinions."

We have little difficulty finding the fair argument standard was met in this case. Many commentators objected to the size and over-all appearance of the proposed building, and it cannot seriously be disputed that this body of opinion meets the low threshold needed to trigger an EIR, as the trial court found.

Although no two cases are precisely on point, many cases, some involving aesthetics, have found lay commentary on nontechnical matters to be admissible and probative, such that they can satisfy the fair argument test. (See, e.g., *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1053-1054 ["personal observations and opinions of local residents on the issue of parking in the area may constitute substantial evidence"] (*Taxpayers*); *Mejia, supra,* 130 Cal.App.4th at p. 339 [similar]; *Ocean View Estates*, *supra*, 116 Cal.App.4th at p. 402 ["overall aesthetic impact . . . by its very nature is subjective. Opinions that [the project] will not be aesthetically pleasing is not the special purview of experts. Personal observation on these nontechnical issues can constitute substantial evidence"]; *Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1348 [attorney for homeowners association described various problems including "aesthetics of the existing and proposed" structures]; *Oro Fino*, *supra*, 225 Cal.App.3d at p. 882 [personal observations of sound impacts from prior similar project]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 173 ["relevant personal observations are evidence"]; see also 1 Kostka & Zischke, Practice Under Cal. Environmental Quality Act, *supra*, Initial Study, § 6.42.)

While a few stray comments may not be enough, "The evidence here goes beyond a few people expressing concern about the aesthetics of the project. There is substantial evidence to support a fair argument that the project may have a significant adverse aesthetic impact." (*Ocean View Estates*, *supra,* 116 Cal.App.4th at p. 403; see *Grand*

16

*Terrace*, *supra*, 160 Cal.App.4th at pp. 1337-1338 [distinguishing *Bowman*; "there is evidence the environmental impact is not just obstruction of the views of a few adjacent homeowners. The impact creates a change in the aesthetic environment and interferes with scenic views of the public in general . . . . Aesthetic issues, such as public views, 'are properly studied in an EIR to assess the impacts' "]; cf. *Clover Valley*, *supra*, 197 Cal.App.4th at p. 243 [EIR case; CEQA is concerned with project's effects on the environment, not individualized complaints]; *Taxpayers, supra,* 215 Cal.App.4th at p. 1042 [individualized aesthetics complaints do not meet fair argument standard].)

In this case, a large number of interested people believe this project would have a significant and negative effect on aesthetics. They have commented that the project is too big and too boxy or monolithic to blend in, such that its presence will damage the look and feel of the historic center of Georgetown. That is enough to trigger an EIR.

"[T]he significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Cal. Code Regs., tit. 14, § 15064, subd. (b).) The project at issue here *might* fit smoothly into a different town of similar size. But the central district of Georgetown has retained its historic character and the larger stores in Georgetown are outside of the central district. Sufficient evidence was adduced to show *this* project in *this* location *might* significantly impair the central district's unique and treasured Gold Rush character.

In separate portions of their briefing, appellants seek to limit the permissible scope of lay opinion, arguing the various commentators lack sufficient qualifications to comment as to whether "the Project conforms to the technical architectural standards of the Historic Design Guide" and arguing that "the record shows that only two minor aspects of the design are potentially inconsistent with the Historic Design Guide: (1) the use of a faux wooden monument sign; and (2) the automatic doors. [Citation.] It is therefore Society's burden to establish that substantial evidence in the record supports a

17

fair argument that the Project may have significant aesthetic impacts *based on* the potentially incongruent visual character of these two specific elements."

In another part of their brief appellants also claim comments about lighting, which appear to overlap the issue of signage, lacked foundation. But as we have explained, the County's design review process does not supplant or supersede CEQA review. The County lacks authority to limit potential impacts to be considered, whether in an initial study or an EIR, and compel challengers to abandon claims about other potential impacts. Here, project opponents object to the size and overall appearance of the project, nontechnical matters that do not require special expertise.[7] Nor do we see why the

---

[7] Appellants repeatedly cite *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, a case also involving a proposed Dollar General store. *Joshua Tree* bears only a superficial resemblance to this case. There public comments "were overwhelmingly negative. A common theme was that the Project would be 'out of character and scale with the small business rural desert family-owned [and] operated business community in Joshua Tree.' " (*Id*. at p. 682.) The trial court issued a writ compelling an EIR regarding *urban decay*, not *aesthetics*. (*Id*. at p. 683.) *Joshua Tree* found the evidence relied on by the trial court lacked foundation, because the sole relevant commentator, who was both a lawyer and business owner, lacked expertise to render an opinion on urban decay as she was neither an economist nor did she have an MBA. (*Id*. at pp. 690-692.) On those facts the court concluded that " 'we must give the lead agency the benefit of the doubt on any legitimate, disputed issues of credibility. [Citation.]' [Citation.] Here, at a minimum, there were legitimate issues regarding the credibility of Doyle's opinions. Hence, the County could deem them not substantial evidence." (*Id*. at p. 692.) *Joshua Tree* does not clearly explain whether the public agency had made specific foundational findings about this evidence, far less discuss the issue whether credibility findings may be inferred. (See Part IV, *post*.) Cases are not authority for propositions not considered. (See *Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1184-1185.) We agree with *Joshua Tree* that urban decay is a technical subject requiring expert opinion, but as we have explained, aesthetics is a nontechnical subject within the purview of lay opinion.

At oral argument the County referenced a recent decision that found non-expert efforts to recalculate noise impacts did not provide substantial evidence to support a fair argument, but that case is so factually different it does nothing to advance the County's

18

comments should be analyzed solely as they relate to doors, signage, and lighting; that views the issue through an unduly narrow prism. While most of the commentators lacked the background to apply the County's design standards, a rational layperson familiar with the area could conclude a 9,100 square foot chain store spanning three lots *may* negatively impact the central district's aesthetics. Thus, the efforts to dissect and discredit comments based on purported lack of foundation fail to persuade.

In reaching our conclusion we, like the trial court, have not considered evidence of general societal conditions or economic consequences or individualized impacts, as appellants would have us do. As we have described *ante*, the evidence clearly shows that the low-threshold fair argument test has been met. Despite the subjective nature of aesthetic concerns, it is clear that the project *may* have a significant adverse environmental impact. Whether it likely *will* or *will not* have such an impact is a question that an EIR is designed to answer.[8]

IV

*Lack of Evidentiary Findings*

Appellants argue the trial court improperly applied what they call a "particularity principle." The County did not make explicit evidentiary findings (such as lack of foundation or credibility). For this reason, the trial court considered all of the evidence presented. Appellants point to a statute barring courts from interpreting CEQA "in a manner which imposes procedural or substantive requirements beyond those explicitly stated" by CEQA statutes or regulations. (§ 21083.1.) They argue a lead agency need

---

claim herein, regarding aesthetics. (See *Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 893-895.)

[8] We do not hold or imply that the project is fatally incompatible with its proposed location, nor that the project is detrimental. We merely hold that the very low fair argument standard regarding aesthetic impacts, a nontechnical subject, was met. The EIR process will inform as to whether the project has a negative environmental impact.

19

not explain why it is disregarding evidence in order for a project opponent to interpose foundational or credibility claims in a judicial forum.

The trial court's detailed written ruling in part made the following finding:

"Respondent's brief does not cite to any portion of the administrative record wherein the County rejected as lacking credibility any of the public comment evidence in the administrative record relied upon by petitioner. Therefore, the court rejects respondents' contention that [such] evidence in the record relied upon by petitioner should be regarded as incredible and ignored when applying the fair argument standard."

Appellants now in part make the following argument:

"Here, the County reasonably found that lay opinions of even longtime residents did not amount to substantial evidence where those lay opinions lacked a factual basis, ignored the project's substantial compliance with the County's Historic Design Guide, and were contradicted by undisputed experts in historic architecture and the County's reasonable finding of General Plan consistency."

But as the trial court noted, the County never made any such finding, "reasonably" or otherwise. The court referenced extant authorities holding that in order for a project proponent to preserve attacks on comments based on lack of foundation or credibility, explicit findings discounting those comments must be made. (See *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 207-208 [another rule "would directly contradict the general principle that the existence of sufficient evidence to create a fair argument is a question of law;" "To assist courts in distinguishing between after-the-fact justifications and situations where a question of credibility was legitimate and actually addressed by the agency, this court adopted the following principle: '[B]efore an agency may rely on its purported rejection of evidence as incredible, it must first identify that evidence with sufficient particularity to allow the reviewing court to determine whether there were legitimate, disputed issues of credibility' "]; *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1597 ["Were we to accept County's broad-brush assertion of the incredibility of plaintiffs' evidence, the

20

fair argument test would be effectively eviscerated because much of the evidence submitted in [CEQA proceedings] comes from people and entities who are interested in the outcome of the lead agency's decision"].)

Similarly, in *Pocket Protectors* we rejected a project proponent's claim that a city council found the credibility of public comment wanting, pointing out that the relevant findings "do not discuss any opposing evidence: they merely recite generally that substantial evidence of a significant effect on the environment does not exist.  Thus, we see no specific credibility call by the City Council which requires deference."  (*Pocket Protectors*, *supra*, 124 Cal.App.4th at pp. 934-935.)

Further, a treatise authored by principles of the law firm representing real parties (which also represented the project proponents in *Pocket Protectors*) states as follows:

> "Under the cases discussed . . . if the lead agency concludes that evidence that a project may have a significant environmental impact is insubstantial because it is unreliable, incredible, or inherently improbable, then a reviewing court may accord that determination some deference.  In the authors' view, to qualify for such deference the lead agency should take care to identify the evidence in question with particularity, and explain why the agency regards the evidence as insubstantial.  Absent this information, a reviewing court might have an inadequate basis for deferring to the agency's determinations regarding the substantiality of that evidence."  (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (11th ed. 2006) Negative Declarations, p. 277.)

We agree.  The cases on this point, including *Pocket Protectors*, support the rule followed by the trial court.  We do not view this as layering a court-made procedural rule onto CEQA review procedures.  Instead, it is a basic rule of administrative review that precludes a party from manufacturing after-the-fact findings that an agency never made.

Finally, even if we considered the credibility and foundational objections appellants claim the County sustained at least impliedly, we would find the County abused its discretion.  Many of the commentators were local residents and therefore capable of giving a lay opinion on the nontechnical aesthetic issues of size and general appearance.  The large number of negative opinions undermine the argument that only a

21

few individualized complainants are trying to thwart the project for personal reasons. Appellants have provided no authority for their implicit view that residents must provide the kind of foundation that an expert witness at a trial might be expected to provide or declare their opinions under penalty of perjury, and imposing such requirements would needlessly muffle legitimate commentary on matters of public interest, contrary to the informative purpose of CEQA.  (See 1 Kostka & Zischke, Practice Under Cal. Environmental Quality Act, *supra*, Purpose and History of CEQA, § 1.18 [one CEQA purpose is "to inform government decision-makers and the public about the potential significant environmental effects"].)

## DISPOSITION

The judgment is affirmed.  The Georgetown Preservation Society shall receive its costs on appeal.  (See Cal. Rules of Court, rule 8. 278(a)(1).)


        /s/
        Duarte, J.


We concur:


    /s/
Butz, Acting P.J.


    /s/
Murray, J.